FILED
OCT 2 3 2010
Oct 22, 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT,
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Randall Noble, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. |
| ) | |
| NORTHEAST ILLINOIS REGIONAL ) | 1:10-cv-06821 |
| COMMUTER RAILROAD ) | Judge Joan B. Gottschall |
| CORPORATION d/b/a/ METRA, ) | Magistrate Judge Nan R. Nolan |
| ) | |
| Defendant. ) | |

## COMPLAINT AT LAW

NOW COMES plaintiff, RANDALL NOBLE, and brings this action for employment discrimination on the basis of race against Defendant, NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION d/b/a METRA as follows:

### PARTIES

1. Plaintiff Randall Noble (hereafter referred to as "Noble") is an Illinois citizen, residing at 2094 Tyler Drive, Lynwood, IL 60411. Noble is African American.

2. Northeast Illinois Regional Commuter Railroad Corporation, (hereafter referred to as "Metra") is a corporation with its principle place of business in Illinois at 547 West Jackson Boulevard, Chicago, IL 60661.

### JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, as amended, 28 U.S.C. § 2000(e), *et seq.*, as amended in the Civil Rights Act of 1991, (referred

to herein as "Title VII"), and has jurisdiction over claims brought under § 1981 of the 1871 Civil Rights Act, 42 U.S.C. § 1981 (referred to herein as "§ 1981") through 28 U.S.C. 1343.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the claims in this action occurred in this judicial district.

5. Plaintiff filed a timely "Charge of Discrimination" with the Equal Employment Opportunity Commission alleging racial discrimination and retaliation. Plaintiff brings this action within ninety dates of receipt of a right to sue letter from the EEOC.

## FACTUAL BACKGROUND

6. In or about April 2009, Plaintiff Noble commenced working for Defendant Metra and has been continually employed with Metra through the present.

7. Noble's job title is engine watchman, a position with responsibilities including, but not limited to, monitoring engine temperatures and ensuring that no engines freeze.

8. At all times relevant hereto, Noble worked as a full time employee and his last standard work schedule was 8am to 4pm, Monday through Friday.

9. Noble works primarily at the Western Avenue site (hereafter referred to as "Western"), located at 2741 West Grand Avenue, Chicago, IL 60612, but has also worked at other Metra sites, including but not limited to, Fox Lake and Elgin.

### Discriminatory Practices

10. At all times relevant hereto, there were no African American foreman at the Western site.

11. At all times relevant hereto, African American engine watchmen at Western, did not receive the standard, required 30 days training while Caucasian employees generally received such training.

12. Noble received a total of 2 days of training.

13. On information and belief, Noble had scheduled vacation time on July 8, 2010, and Metra subsequently scheduled him for training on this day.

14. On information and belief, untrained African American engine watchmen from Western were assigned tasks and sent to work at sites where the 30 days training was necessary for quality performance and safety purposes.

15. On information and belief, at all times relevant hereto, no African American engine watchmen at Western were sent for electrician training while at least two Caucasian employees were.

16. On information and belief, employees are not allowed to perform electrician work, including but not limited to the handling of 480 cables, unless they had completed electrician training.

17. Noble was required to perform electrician work, including but not limited to, handling 480 cables, changing headlights on the front of locomotives, and changing bulbs inside the nose of locomotives, despite not having received the required training.

18. On information and belief, other African American employees at Western were required to perform electrician work without electrician training while Caucasian employees without electrician training were not similarly required to do so.

19. On information and belief, serious injuries and death have occurred among past Metra employees as a result of improper handling of 480 cables and other kinds of electrician work.

### First Incident

20. In or about June 2010, Noble was working at Metra's Western location.

3

21. At all relevant times hereto, he worked with Dominick Russo ("Russo") and a Mike Pollaro ("Pollaro"), both of whom are Caucasian.

22. Russo worked in the Mechanical lab while Pollaro was the Superintendent of the Diesel shop, a position giving him authority over both Noble and Russo.

23. Russo was designated to be the vacation/vacancy relief worker, meaning that part of his duties included filling in for absent workers.

24. At all relevant times hereto, Noble was not a vacation/vacancy relief worker.

25. On the day in question, in or about June 2010, Pollaro informed Russo to go to Elgin, Illinois, another Metra work site, in order to fill in for an absent worker during the 6pm – 2am shift.

26. On said date and time, Russo, in turn, attempted to order Noble to go in his place, but Noble refused on the grounds that it was not his responsibility and additionally, because he had not received the necessary training.

27. On said date, Noble had been previously scheduled for an 8am to 4pm shift at Western.

28. Russo then threatened to tell Pollaro, but Noble still refused and, instead, continued to fulfill his employment responsibilities at Western.

29. At such date and time, Noble was confronted by Pollaro, who ordered Noble to go to Elgin or else he would be written up for insubordination, pulled from duty, and terminated.

30. Noble still protested on the grounds that he had insufficient training to work at Elgin.

31. On information and belief, on said day, Noble subsequently telephoned Mark Sagoit, Carlos Paz, and Ricky Cruz—three officials from Noble's union.

32. On information and belief, on said date and time, Paz and Cruz both informed Pollaro that Noble's two days of training did not sufficiently equip him to handle the responsibilities associated with going to Elgin.

33. On information and belief, on said date and time, Noble subsequently had a meeting with Pollaro and Mark Simos, the Director of the Western site, during which Simos ordered Noble to go to Elgin despite Noble's assertion of insufficient training.

34. Noble subsequently went to Elgin and, on information and belief, worked the entire 6pm – 2am shift.

35. The next morning, a Metra train was delayed at the Elgin site for 19 minutes.

36. On information and belief, Noble learned that he was blamed for the delay.

37. On information and belief, as a result of the delayed train, Pollaro told Noble he would receive a write up, be pulled from service, and terminated.

38. Noble responded by verbally opposing the unequal training practices employed at Western and suggested the possibility of a race discrimination lawsuit if terminated.

### Second Incident

39. In or about June 2010, Noble was directed to go to Elgin by Pollaro and Simos.

40. Upon arrival, at or about 7pm, Noble was expected to begin a 12-hour shift, and was supposed to be assisted by Ben Robles (Caucasian).

41. On information and belief, Robles arrived at or about 11pm and appeared inebriated.

42. On said date, on information and belief, Robles sent Noble home at 5am, without proper justification, even though Noble's shift was supposed to end at 7am.

43. Two days thereafter, on information and belief, Noble completed a written complaint with Metra against Robles for the incident in question.

44. On information and belief, after completing his written complaint against Robles, another foreman named Bruno told Noble that he was a "marked man."

### Third Incident

45. In or about July 2010, Noble was assigned the task of picking up garbage at the Elgin site.

46. Noble was allotted 20 minutes for lunch, but due to illness, took 40 minutes.

47. After Noble returned to work, on information and belief, Robles interrupted Noble wanting to write him up for taking a long lunch and threatened termination.

48. Following this confrontation, on said day in question, on information and belief, Noble was forced to attend a meeting in Roble's office on the order of Simos. In addition to Noble and Robles, Darren Crouch (Caucasian) was also present at the meeting.

49. Crouch and Robles threatened and intimidated Noble with physical violence during this meeting.

50. At one point during said meeting, Crouch threw a hard hat at Noble.

51. Noble called Metra Police Chief James Sandford after being nearly hit with the hard hat thrown by Crouch.

52. Metra police spoke with Simos about the incident before taking any official action. On information and belief, Simos convinced them to refrain from acting against Crouch and, instead, to take action against Noble.

53. Noble asked Simos why Crouch was being given preferential treatment.

54. In response, on information and belief, Simos informed Noble that he would be suspended for 3 days without pay.

55. In reply, Noble asked Simos if his suspension was "a racial thing." Simons then remained silent.

56. On such date and time, Metra police detained Noble, forced him to submit to a drug and alcohol screening, and escorted him around the Western site in open view causing embarrassment and humiliation to Noble.

### Fourth Incident

57. On or about August 13, 2010, Noble was again working under the supervision of Robles.

58. On said date, Robles accused Noble of leaving his tags on a train, an offense that could lead to termination, and on information and belief, claimed to possess Noble's tags to prove the infraction.

59. At all times relevant hereto, Noble possessed all of his tags.

60. On information and belief, Robles attempted to have Noble suspended and/or terminated by reporting to his superiors, including without limitation, Art Olson, who was third in charge at the Western site.

61. On such date and time, Noble feared for his job and experienced severe anxiety and stress.

62. On such date and time, before a full investigation concluded, Noble experienced chest pain and was transported to Norwegian Hospital Emergency Room for treatment of a myocardial infarction.

63. Noble has been on medical leave since August 13, 2010.

## COUNT I
### *TITLE VII RACIAL DISCRIMINATION*

64.  Plaintiff repeats and realleges Paragraphs 1 through 63, as if fully stated herein.

65.  At all times relevant hereto, Metra was an "employer" under Title VII as it "engaged in an industry affecting commerce" and had "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

66.  Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

67.  Title VII also prohibits employers from taking action designed "to limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race." 42 U.S.C. § 2000e-2(a)(2).

68.  Metra, by and through its agents, employees, or representatives, acting within the scope of their authority, has perpetrated various acts of racial discrimination in violation of Title VII against Plaintiff Noble, including:

   a. Conspiring to have Noble terminated and/or reprimanded for violations of the terms of his employment he did not commit;

   b. Attempting to have Noble terminated and/or reprimanded for violations of the terms of his employment he did not commit;

   c. Denying Noble standard training necessary for personal safety;

   d. Denying Noble standard training necessary for quality work performance;

   e. Forcing Noble to cover undesirable shifts of Caucasian co-workers when he was not responsible to do so;

8

    f. Knowingly disciplining Noble for the mistakes of other workers and/or mistakes he was not trained to avoid;

    g. Reducing Noble's hours without justification by pulling him from service prior to shift completion;

    h. Scheduling Noble for training during times he previously reserved for vacation;

    i. Failing to remedy the discriminatory practices it knew or should have known about;

    j. Otherwise discriminated against Plaintiff Noble.

69. The foregoing acts are and were all motivated by, and or otherwise based upon, racial animus toward Noble.

70. Metra's violation of Noble's civil rights has caused the Plaintiff to sustain and continue to suffer damages.

WHEREFORE, Plaintiffs respectfully request a judgment against Metra as follows:

A. Compensatory damages for the severe humiliation, severe emotional distress, pain and suffering and physical distress caused as a direct and proximate result of Metra's racial discrimination;

B. Compensatory damages for lost wages resulting from discriminatory actions;

C. Punitive damages;

D. Reasonable attorney's fees and costs; and

E. Such further relief as is equitable and just.

## COUNT II
*INTENTIONAL RACIAL DISCRIMINATION IN VIOLATION OF § 1981*

71. Plaintiff repeats and realleges Paragraphs 1 through 63, and paragraphs 65, as if fully stated herein.

72. Section 1981, as amended, of the Civil Rights Act of 1991 prohibits intentional discrimination on the basis of race in employment, including the terms and conditions of employment. 42 U.S.C. § 1981.

73. Metra, by and through its agents, employees, or representatives, has perpetrated one or more of the following acts of intentional racial discrimination against Plaintiff Noble:

    a. Conspiring to have Noble terminated and/or reprimanded for violations of the terms of his employment he did not commit;

    b. Attempting to have Noble terminated and/or reprimanded for violations of the terms of his employment he did not commit;

    c. Denying Noble standard training necessary for personal safety;

    d. Denying Noble standard training necessary for quality work performance;

    e. Forcing Noble to cover undesirable shifts of Caucasian co-workers when he was not responsible to do so;

    f. Knowingly disciplining Noble for the mistakes of other workers and/or mistakes he was not trained to avoid;

    g. Cutting Noble's hours without justification by pulling him from service prior to shift completion;

    h. Scheduling Noble for training during times he previously reserved for vacation;

    i. Failing to remedy the discriminatory practices it knew or should have known about;

    j. Otherwise discriminated against Plaintiff Noble.

74. Because of Metra's wrongful conduct, Plaintiff Noble was deprived of his civil rights causing him to sustain and continue to suffer damages.

WHEREFORE, Plaintiffs respectfully request a judgment against Metra as follows:

A. Compensatory damages for the severe humiliation, severe emotional distress, pain and suffering and physical distress caused as a direct and proximate result of Metra's racial discrimination;

B. Compensatory damages for lost wages resulting from discriminatory actions;

C. Punitive damages;

D. Reasonable attorney's fees and costs; and

E. Such further relief as is equitable and just.

## COUNT III
### *TITLE VII RETALIATION*

75. Plaintiff repeats and realleges Paragraphs 1 through 63, and paragraph 65, as if fully stated herein.

76. Title VII prohibits an employer from discriminating against an employee because he has opposed discriminatory practices or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

77. Plaintiff Noble opposed unlawful practices through verbal objections, complaints to superiors, refusals to comply, and filing a formal charge of employment discrimination with the EEOC.

78. Metra, by and through its agents, employees, or representatives, has perpetrated various acts of retaliatory discrimination against Plaintiff Noble, including:

    a. Conspiring to have Noble terminated and/or reprimanded for violations of the terms of his employment he did not commit;

    b. Attempting to have Noble terminated and/or reprimanded for violations of the terms of his employment he did not commit;

    c. Denying Noble standard training necessary for personal safety;

11

    d. Denying Noble standard training necessary for quality work performance;

    e. Forcing Noble to cover undesirable shifts of Caucasian co-workers when he was not responsible to do so;

    f. Knowingly disciplining Noble for the mistakes of other workers and/or mistakes he was not trained to avoid;

    g. Knowingly causing reputational damage to Noble by improperly causing him to be detained by police at work in open view;

    h. Cutting Noble's hours without justification by pulling him from service prior to shift completion;

    i. Scheduling Noble for training during times he previously reserved for vacation;

    j. Failing to remedy the discriminatory practices it knew or should have known about;

    k. Otherwise discriminated against Plaintiff Noble.

79. Metra's violation of Noble's civil rights has caused the Plaintiff to sustain and continue to suffer damages.

WHEREFORE, Plaintiffs respectfully request a judgment against Metra as follows:

A. Compensatory damages for the severe humiliation, severe emotional distress, pain and suffering and physical distress caused as a direct and proximate result of Metra's racial discrimination;

B. Compensatory damages for lost wages resulting from discriminatory actions;

C. Punitive damages;

D. Reasonable attorney's fees and costs; and

E. Such further relief as is equitable and just.

Respectfully Submitted,

X _Randall A. Noble_
Plaintiff

Randall Noble
2094 Tyler Drive
Lynwood, IL 60411