# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RANDALL NOBLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 10-cv-6821 |
| v. ) | |
| ) | Judge John Z. Lee |
| NORTHEAST ILLINOIS REGIONAL ) | |
| COMMUTER RAILROAD CORPORATION, ) | |
| d/b/a/ METRA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Randall Noble asserts claims under Title VII and 42 U.S.C. § 1981 against Defendant Northeast Illinois Regional Commuter Railroad Corporation, d/b/a/ Metra ("Metra"), alleging that Metra has discriminated against him in his employment based on his race. Noble also claims that Metra retaliated against him when he complained about the discriminatory actions. Metra now has filed a motion for summary judgment with respect to these claims. For his part, Noble contends that the record precludes summary judgment and, alternatively, asks to reopen discovery. For the reasons provided below, the Court grants Metra's motion for summary judgment and denies Noble's motion to reopen discovery.

### I. Factual Background[1]

Noble, an African-American, began working for Metra in April 2009 as a Laborer. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 1, 4. Noble last worked for Metra on August 13, 2010. *See id.* ¶ 4. Noble generally concedes that, during his time at Metra, he was never subjected to termination, reprimand, discipline, demotion, wage diminution, a loss of benefits or job responsibilities, or

---

[1] The following facts are undisputed unless otherwise noted.

seniority loss. *See id.* ¶ 6. Noble also concedes that he was never subjected to racially-charged comments or jokes, and was never told that any actions taken at work were due to his race. *See id.* Noble, however, does believe that he experienced incidents of racial bias at the hands of Metra, *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6, and identifies four incidents he believes support his claims.

### A. May 31, 2010, Incident

On May 31, 2010, Noble was scheduled to work the 8:00 a.m. to 4:00 p.m. shift at Metra's Western Avenue Yard. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 7. Noble, however, was ordered to go to the Elgin Yard and work an overnight shift. *See id.* ¶ 8. The parties dispute precisely who gave the order to work and the wording of the order. According to Metra, Noble's supervisor ordered him to work the 7:00 p.m. to 7:00 a.m. shift. *See id.* Noble believes that Dominick Russo, a junior coworker, ordered him to work the 6 p.m. to 2 a.m. shift. *See* Pl.'s LR 56.1(b)(3)B) Stmt. ¶ 8.

In any case, Noble refused to work the night shift, stating that the shift was "not his responsibility" and that he had not received the "necessary training." *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 9. According to Noble, he had only received two days of training, which (at least, according to Noble) was insufficient to perform the tasks required on the night shift. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 9. In particular, Noble believes that he should have been provided training at an electrician school, because some of the tasks he performed for Metra involved handling electrical equipment. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 10; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 10. That said, it is undisputed that Noble never worked as an electrician for Metra. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 10.

Noble's supervisor threatened to write him up for his refusal to work the night shift at Elgin Yard. *See id.* ¶ 11. Noble never bore any adverse consequences after this threat, however. *See id.* ¶ 12. After protesting, Noble proceeded to work the night shift at the Elgin Yard. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 12.

### B. June 1, 2010, Incident

On June 1, 2010, Noble was working the night shift at the Elgin Yard when a train was delayed for nineteen minutes. According to Metra, Noble admitted that he caused the delay because he did not know what he was doing. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 13. Noble was threatened with a write-up for causing the delay. *See id.* ¶ 14. Nevertheless, Noble never bore any adverse consequences as a result of this incident. *See id.* ¶ 15. Noble was sent home early, two hours before the end of his shift, at 5 a.m. *See id.* ¶ 16.

Noble remembers the incident slightly differently. According to him, the train delay incident must have occurred on a day other than June 1, 2010, because he had left the yard at 2 a.m. that day and recalls that the confrontation with his supervisor over the train delay took place at approximately 9 a.m. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 13. Noble agrees that he was sent home two hours early, but believes the incident occurred on a third shift on a third day based upon the shift times. *See id.* ¶ 16.

In any event, Noble filed a written complaint against the foreman who sent him home. *See* Def.'s LR 56.1(a)(3) ¶ 17; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17. Metra investigated Noble's complaint, determined that the foreman had sent Noble home early without justification, and compensated Noble for the two hours he had missed. *See* Def.'s LR 56.1(a)(3) ¶ 18. After Noble filed his complaint, another unidentified foreman approached him and told him he was a "marked man." *See id.* ¶ 19. Noble found this comment to be unsettling, but was unsure what

3

exactly the foreman meant by it. *See* Def.'s LR 56.1(a)(3) ¶ 20; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 20. Aside from this comment, however, Noble did not suffer any adverse consequences after filing the written complaint. *See* Def.'s LR 56.1(a)(3) ¶¶ 21–22.

### C. June 11, 2010, Incident

The third incident occurred on June 11, 2010, while Noble was working at the Elgin Yard. *See* Def.'s L 56.1 Stmt. ¶ 23. He developed an upset stomach and took approximately forty to sixty minutes for his lunch break, exceeding his allotted twenty minutes. *See id.* ¶ 24. Noble did not have authorization to spend more than twenty minutes for lunch, and he did not notify a supervisor that he would be out longer than twenty minutes. *See id.* ¶ 25. A foreman finally located Noble; Noble claims he was "interrupted" by the foreman and that the foreman threatened to write him up. *See id.* ¶ 26. Noble does not dispute that he suffered no adverse employment consequences as a result of this incident. *See id.* ¶ 27; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 13.

After the lunch confrontation, Noble's supervisor, Mark Simos, ordered him to attend a meeting with another foreman, Ben Robles, to account for his unauthorized absence. *See* Def.'s L 56.1 Stmt. ¶ 28; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 28. At this meeting, Noble claims that Robles and another foreman, Darren Crouch, were abusive, used threatening language, and threw a hard hat at him, which nearly struck him. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 29, 31; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29. According to Noble, while he was preparing a written account of his absence, Crouch made increasingly abusive comments towards him, telling him to "hurry up" to write his report and "get out of this office," finally stating, "You motherf##ker, I'll kick your ass." *See generally* Def.'s LR 56.1(a)(3) Stmt. ¶ 30 (detailing conversation); *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30.

Noble called the Metra Police Chief and demanded that the police come to arrest the foreman for verbal assault. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 32. The police officers arrived but took no action; Noble believes that his supervisor convinced the officers to take action against Noble instead, though he did not overhear the conversation between the police officers and his supervisor. *See id.* ¶ 33. Simos then told Noble that he would be subjected to a drug and alcohol screening. *See id.* ¶ 34. Noble asked Simos if this suspension was a "racial thing," because Crouch was white, but Simos gave no reply. *See id.* ¶ 36; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36.

Noble was screened and suspended for three days pending the results. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35. The screening was negative, and Noble was immediately reinstated with full pay for the three-day suspension. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 37. Noble suffered no additional consequences. *See id.*

That same day, on June 11, 2010, Noble and a coworker were standing outside the Western Avenue shop when a foreman came by and "balled up his fist and raised it back and came in a striking motion towards" him. *See id.* ¶ 38. Noble believes this happened on a different day. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 38. Regardless, that same day, Noble was tasked with driving employees to a 2010 Chicago Blackhawks Stanley Cup parade and was told to "get out of [a] van," an "order" which Noble did not follow. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 39. No adverse employment consequences followed this van incident. *See id.* ¶ 40.

### D. August 13, 2010, Incident

The last incident at issue occurred on August 13, 2010, when a foreman accused Noble of leaving his tags on the train, an infraction that could justify termination. *See id.* ¶ 41. But Noble is certain that, on August 13, 2010, he had all his tags with him. *See id.* ¶ 43. Noble asserts that

he suffered chest pains as a result of the incident, spent a day in the hospital, and could not work overtime the following weekend. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 44.

Since August 13, 2010, Noble has been on medical leave. *See id.* ¶ 45. Noble has not had any further dealings or interactions with Metra or its employees since August 13, 2010. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 46.[2]

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.,* 674 F.3d 769, 772–73 (7th Cir.2012). In conducting its inquiry, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 529 (7th Cir. 2000).

---

[2] Noble has included in his Local Rule "supplementary statement of facts" assertions regarding a January 2011 investigation that took place after he had started his medical leave in August 2010. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 2–10. Metra moves to strike these facts, arguing that the Court has ruled that Noble could not amend his complaint at the eleventh hour to add these new allegations. *See* Def.'s Reply Pl.'s LR 56.1(b)(3)(C) Stmt. 2. This is correct. On December 14, 2015, the Court ruled that Noble could not amend his complaint to include conduct post-August 2010, *see* 12/9/14 Tr. 22:5–10 (denying Rule 15(d) motion to amend complaint and add FMLA-related claims), and reiterated this ruling on January 14, 2015. *See* 1/14/15 Tr. 13:16–18. Accordingly, the Court strikes Paragraphs 2–10 of Noble's supplementary statement of facts.

### III. Analysis

Noble brings claims of racial discrimination and retaliation under Title VII (Counts I and III) and a claim for "intentional discrimination" under 42 U.S.C. § 1981 (Count II). Claims for discrimination under 42 U.S.C. § 1981 are typically analyzed under the same standard as those brought under Title VII. *See Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). As such, the Court's analysis of Noble's Title VII discrimination claim controls the outcome of Noble's claim under 42 U.S.C. § 1981 as well.

    A.    **Title VII Discrimination (Counts I and II)**

"A Title VII plaintiff seeking to defeat a summary judgment motion must present either (1) direct or circumstantial evidence of discrimination (the 'direct method') or (2) indirect evidence that establishes a prima facie case and satisfies the burdenshifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–02 (1973) (the 'indirect method')." *Mustafa v. Ill. Prop. Tax Appeal Bd.*, --- F. Supp. 3d. ----, No. 12 C 7916, 2014 WL 4637200, at *4 (N.D. Ill. Sept. 17, 2014) (citing *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 591–92 (7th Cir. 2008)).

The direct method presents two paths to trial. First, "a plaintiff can offer direct evidence of discrimination, which is typically an outright admission by the decisionmaker that the challenged action was undertaken because of the plaintiff's [protected class]." *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) *cert. denied*, 135 S. Ct. 159 (2014) (internal quotations omitted). Second, "[i]f a plaintiff lacks direct evidence, the plaintiff can proceed 'under the direct method using circumstantial evidence.'" *Id.* (internal quotations omitted). "Circumstantial evidence can take a number of forms, such as suspicious timing, behavior or comments directed at members of the protected group, evidence showing that similarly-situated

employees outside the protected group received systematically better treatment, and evidence that the reason the employer gave for the adverse action was pretextual." *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 803 (7th Cir. 2014).

Under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination. To do so, he must offer evidence that: "(1) [he] is a member of a protected class, (2) [his] job performance met [the employer's] legitimate expectations, (3) [he] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than he was." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). "Once a prima facie case is established, a presumption of discrimination is triggered" and "'[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802). "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.*

Metra's primary argument is that Noble cannot meet his burden under either the direct or indirect method, because there is no evidence that he suffered an "adverse employment action" in connection with the four incidents. Proof of an adverse employment action is "an element of any Title VII claim, regardless of whether the claim is reviewed under the traditional direct/indirect framework or the less rigid framework [that Seventh Circuit] cases have recently suggested." *Chaib*, 744 F.3d at 982. "A cognizable adverse employment action is a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"

*Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. E.P.A.,* 232 F.3d 546, 555 (7th Cir. 2000)).

The Seventh Circuit has described three categories of actions that qualify as adverse employment actions under Title VII:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). And, although "[t]he definition of an adverse employment action is generous . . . it is still subject to certain limitations:" a plaintiff "must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

Here, there is no evidence that Noble suffered any materially adverse employment actions as a result of the four incidents in question. In fact, Noble has affirmatively testified that he suffered no adverse employment actions following each of the incidents identified in his complaint. He admits he was never terminated, reprimanded, subjected to charges, pulled from service, nor disciplined in any manner while working for Metra. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 6, 12, 15, 22, 27, 37, 40, 44; Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 6, 12, 15, 22, 27, 37, 40, 44. Noble also testified that he never lost seniority, was demoted, incurred a decrease in salary or wages,

9

received a less distinguished job title, lost benefits, or had his job responsibilities lessened in connection with the four incidents at issue. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 6, 12, 15, 22, 27, 37, 40, 44. Additionally, Noble testified that he was never subject to any racially-charged, offensive, or derogatory comments related to the four events and was never told that actions taken relative to training or assignments were based on race. *See id.*

Furthermore, there is no other evidence in the record to indicate that Noble suffered an adverse employment action as a result of the four incidents. Noble suffered no pecuniary loss. He did lose some pay when he was sent home early on June 1, 2010, and was required to stay home for three days while waiting for the drug test results later that same month. But Noble was immediately compensated for these losses. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 16, 18, 35–37. Such temporary losses of pay are insufficient to constitute adverse employment actions. *See Herron Daimler Chrylser Corp.*, 388 F.3d 293, 301 (7th Cir. 2004) (two-month delay in overtime payment not an adverse employment action); *see also Matthews v.* Donahoe, 493 F. App'x 796, 800 (7th Cir. 2012) ("[T]he mere two-month delay in [plaintiff's] continuation of pay, though an annoyance, had no effect on the terms of her employment."). Additionally, there is no evidence that Noble was subject to a transfer that reduced his career prospects. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 4.

For his part, Noble argues that Metra discriminated against him by failing to provide him with electrical training, which he claims was "necessary for personal safety," presumably viewing this as an adverse employment action. *See* Pl.'s Compl. ¶¶ 68(c) & (d), 73(c) & (d), 78(c) & (d); Def.'s LR 56.1(a)(3) Stmt. ¶ 10. Metra responds that the lack of electrical training cannot constitute an adverse employment action because Noble was hired as a laborer and not an electrician and, as a result, receiving electrical training would have had no bearing on his career

prospects. *See* Def.'s Mot. Summ. J 6. Noble takes issue with this and asserts that laborers do perform electrical tasks as part of their work. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 10. Specifically, at least according to Noble, Metra laborers are asked to plug in 480-volt cables, work inside the main engine compartment of trains, change electrical bulbs, and remove electrical boxes. *See* Def.'s LR 56.1(a)(3) Stmt., Ex. B (Dep. Randall Noble, 142:15–24.).

Although these tasks may be required of Metra's laborers, there is no evidence that formal training as an electrician is necessary to perform these rather rudimentary tasks.[3] After all, lay people change electrical bulbs, plug in industrial-strength appliances, and work with electrical boxes in their homes all the time, all without the need for formal electrical training. What is more, there is no evidence that a laborer with formal electrical training would receive greater benefits – either by way of promotion, greater compensation, or otherwise – as compared to their colleagues. Accordingly, a reasonable jury could not conclude from this record that Metra's refusal to provide electrical training to Noble (assuming it did so) constituted an adverse employment action actionable under Title VII.

However, even assuming, for the sake of argument, that there exists a factual dispute as to whether Metra's refusal to provide electrical training to Noble constituted an adverse employment action, Noble's discrimination claim based upon this action would still fail. As discussed, absent direct evidence of racial aminus (not present here), in order to survive summary judgment, Noble first must establish a *prima facie* case that Metra's refusal was based upon race under the indirect method. To do so, Noble must present evidence that he was: (1) "eligible for training" and (2) "that [he] was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, that [he] was denied training given to other similarly

---

[3] The Court notes that Noble himself was somewhat equivocal as to whether he actually had to perform this type of work. *See id.* 145: 7–22; 149: 14–19.

situated employees who were not members of the protected group." *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998). Neither requirement is established here.

Noble has presented no evidence demonstrating that he was eligible for electrical training (or even what was required to be eligible for such training). And, even if such evidence did exist, Noble does not provide specific evidence that similarly-situated white laborers had requested and were granted formal electrical training. It is true that Noble testified in his deposition that "several white employees," who worked as laborers, did receive electrical training. *See* Def.'s LR 56.1(a)(3) Stmt., Ex. B (Noble Dep., 141:10–13). But such conclusory assertions, without additional evidence, are insufficient to withstand summary judgment. *See Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (affirming summary judgment where plaintiff identified a white comparator with the same title, but did not present evidence that they were comparable in experience); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 615 (7th Cir. 2001) (affirming summary judgment where plaintiff offered only her conclusory assertions that "male officer" was treated more favorably).

In his response, Noble identifies a number of additional occurrences that he contends qualify as adverse employment actions. For example, Noble claims that the events of August 13, 2010, stressed him out so much that he suffered chest pains and was taken to the hospital. *See* Pl.'s Mem. Opp'n 2; Pl.'s LR 56.1(b)(3)(B) Stmt., Suppl. Facts ¶ 2. This is unpersuasive. First, Noble makes no effort to show that his stress condition was caused by Metra's challenged actions. *See Gul-E-Rana Mirza v. The Neiman Marcus Grp., Inc.*, 649 F. Supp. 2d 837, 858 (N.D. Ill. 2009) ("[T]he existence of a materially adverse employment action is based on the objective conduct of the employer rather than the subjective, psychic response of the employee."). Second, even assuming for the sake of argument that Noble's chest pains and

hospital visit did qualify as an adverse employment action, Noble has offered no evidence, direct or circumstantial, that the foreman's actions were motivated by a discriminatory animus. Nor does he provide any evidence that similarly-situated white laborers were allowed to leave their tags on the train after their shift, free from reprimand. *See Bio*, 424 F.3d at 597. Additionally, Noble claims that he lost a weekend of potential overtime pay. But there is no evidence that Metra is required to approve all requests for overtime pay, or that overtime was even available at that time. *See Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) ("[E]ven the denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary."). Accordingly, on this record, Noble cannot succeed on his discrimination claim based on the August 13, 2010, incident.[4]

In sum, there is no evidence creating a genuine dispute as to whether Noble suffered an adverse employment action arising from the four events in questions as required by Title VII. And, even if there were, the evidence is insufficient to create a material dispute as to whether Metra's actions were motivated by racial animus. As such, the Court grants summary judgment in Metra's favor with respect to Plaintiff's racial discrimination claims under Title VII and 42 U.S.C. § 1981.[5]

---

[4] Noble also attempts to challenge the propriety of Metra's investigation into the medical leave that he commenced on August 13, 2010, as well as a subsequent hearing conducted by Metra regarding that leave. *See* Pl.'s Mem. Opp'n 2 2–3; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 8–10. These allegations, however, are not relevant to the current claims, but to certain claims under the Family Medical Leave Act that Noble attempted to include as part of this case. That request was denied for the reasons previously stated by the Court. *See* 1/14/15 Tr. 13:16–25.

[5] Metra also seeks summary judgment as to what it sees as an implicit "hostile work environment" claim under Count II. To the extent that Noble is making this claim, it also falls short. The standards for a hostile work environment claim are high. Noble must offer evidence that Metra's work environment is "permeated with discriminatory intimidation, ridicule, and insult." *Cooper–Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). Noble has not done so. Noble offers one final argument: that Metra has ignored racial remarks directed towards him. *See* Pl.'s Mem. Opp'n 3. But as Noble himself admits,

## B. Title VII Retaliation Claim (Count III)

"In addition to forbidding discrimination directly, Title VII also forbids employers from retaliating against employees by taking adverse employment actions for complaining about prohibited discrimination." *Chaib*, 744 F.3d at 986. "The showing a plaintiff must make to set out an adverse employment action required for a retaliation claim is lower than that required for a discrimination claim; a plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." *Id.* at 986–87. "Even with that lower standard, 'petty slights, minor annoyances, and simple lack of good manners' do not suffice." *Id.* at 987 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Noble's only complaint about racial discrimination occurred when he asked his supervisor on June 10, 2010, whether his foreman's decision to suspend him for three days without pay and subject him to alcohol screening was based on race. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 36; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36. Accordingly, Plaintiff's retaliation claim must be based on actions that took place after that date. *See Durkin v. City of Chi.*, 341 F.3d 606, 614–15 (7th Cir. 2003) ("[I]t is axiomatic that a plaintiff [must] engage in statutorily protected activity before an employer can retaliate against [him] for engaging in statutorily protected activity . . . . An employer cannot retaliate if there is nothing for it to retaliate against.")

The only event that took place after June 10, 2010, was the accusation by Noble's foreman that Noble had left his tags on the train on August 13, 2010. *See* Def.'s LR 56.1(a)(3)

---

the complaint contains no such claims. *See id.* n.2. And, to the extent that Noble seeks leave to amend his complaint to add these allegations, this request is denied as being untimely and unduly prejudicial. *See Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir. 1999) (affirming denial of leave to amend complaint "well after the close of discovery and on the eve of summary judgment proceedings").

Stmt. ¶ 41.[6] But the foreman's reprimand had no further consequences. "'Even under the more generous standard that governs retaliation claims,' a reprimand 'without more' is not an adverse employment action." *Chaib*, 744 F.3d at 987 (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003)). Furthermore, it is undisputed that Metra never investigated Noble, suspended him, or otherwise took any action based on the foreman's accusation. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 44. In fact, it is unclear whether Metra even knew about the reprimand at all prior to this lawsuit, which further undercuts Noble's retaliation claim. *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) ("An employer must have actual knowledge of the employee's protected activity to state a claim for retaliation.").

Moreover, even if Noble had evidence of an adverse employment action, "Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]" *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* Here, there is no evidence that Noble's June 11 complaint was the "but for" cause of the foreman's accusation on August 13. The events were more than two months apart, and even then, timing alone cannot establish "but-for" causation without other facts that create "an inference of a causal connection." *See, e.g., Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (quoting *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008)). No such facts exist in the record.[7]

---

[6] Noble had no contact with Metra or any of its employees after that date. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 46.

[7] Noble further cites to *Benuzzi v. Board of Education of the City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011), but that case does not support Noble's contention that the foreman's actions qualified as an adverse employment action. *See id.*, 647 F.3d at 665 (noting that even "written warnings, standing alone, do not constitute materially adverse actions").

For these reasons, the Court grants Defendant's motion with respect to Plaintiff's retaliation claim.

### C. Motion for Additional Discovery

In separate motion, Noble moves the Court to reopen discovery under Federal Rule of Civil Procedure 37. *See generally* Pl.'s Mot. Open Discovery and Compel. "Rule 37 of the Federal Rules of Civil Procedure authorizes the imposition of sanctions for a litigant's failure to cooperate in the discovery process." *Hindmon v. Nat'l-Ben Franklin Life Ins. Corp.*, 677 F.2d 617, 620 (7th Cir. 1982). "[T]he entry of dismissal or default judgment under Rule 37 requires a showing of 'willfulness, bad faith, or fault' on the part of the non-complying party." *Id.* "It is equally well settled that the choice of an appropriate discovery sanction is primarily the responsibility of the trial judge" and subject to that judge's discretion. *Id.*

In short, Noble asks this Court to impose sanctions on Metra by reopening discovery in this case, compelling Metra to produce Noble's entire personnel file, and entering a finding of perjury against Metra and their counsel. *See* Pl.'s Mot. Open Discovery and Compel 1–2. The basis of the motion is Noble's contention that Metra withheld certain charges that he filed against Metra in January 2011. But these documents appear to be related to Noble's FMLA claims that were disallowed in this proceeding. Consequently, to the extent that they were not produced as part of discovery, Noble suffered no prejudice, and the request for a discovery sanction is denied.[8]

Although somewhat of a stretch, Noble's motion could be construed as a request under Rule 56(d) for additional discovery. But Rule 56(d) "requires a party to state the reasons why it cannot adequately respond to the summary judgment motion without further discovery and must

---

[8] The Court also notes that, due in large part to Noble's *pro se* status, discovery has been extended six times in this case already. *See* Def.'s Mot. Summ. J. 2 (citing Dkt. Nos. 44, 47, 53, 56, 58, and 66).

support those reasons by affidavit." *Waterloo Furniture Components v. Haworth*, 467 F.3d 641, 648 (7th Cir. 2006). No such showing is offered here. *See also Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002) (Rule 56(d) motion is "flawed" if the evidence sought is not relevant to the case).

Finally, the references to Rule 15(d) in the motion could be construed (again, liberally) to be a request that the Court reconsider its denial of Noble's requests to amend his complaint to add his FMLA claims. However, "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984)). To succeed on a motion for reconsideration, Noble "must present either newly discovered evidence or establish a manifest error of law or fact." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). No new facts or arguments are made here. Accordingly, to the extent that Noble requests the Court to reconsider its prior decision, it is denied.

### IV. Conclusion

For the reasons provided herein, the Court grants Defendant's motion for summary judgment [92]. The Court denies Plaintiff's motion to reopen discovery and compel [112]. Civil case terminated.

**SO ORDERED**                               **ENTERED 9/16/15**

                                                                           _____

                                                                           **John Z. Lee**
                                                                           **United States District Judge**